**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **AMERICAN CIVIL LIBERTIES** | ) | |
| **UNION OF KANSAS AND WESTERN** | ) | |
| **MISSOURI,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 11-cv-2462-JAR-KGG** |
| **SANDY PRAEGER, Kansas Insurance** | ) | |
| **Commissioner, in her official capacity,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

Plaintiff filed this action challenging the constitutionality of a Kansas statute regulating health insurance coverage for abortion procedures. The Kansas law prohibits insurers in the State from providing coverage for certain abortions under comprehensive health insurance policies. It provides that such coverage may be provided through a separately purchased rider. The ACLU claims the law violates its members' Fourteenth Amendment rights to due process and to equal protection of the laws. The matter is now before the Court on Defendant Sandy Praeger's Motion for Partial Judgment on the Pleadings (Doc. 29), which argues that the Complaint fails to state any cognizable claim for violation of the right to equal protection. For the reasons stated below, the Court concludes that Defendant's motion for judgment on the equal protection claim should be denied.

**I.** **Facts**

The following facts are alleged in the Second Amended Complaint and viewed in the

light most favorable to Plaintiff.[1]  Plaintiff American Civil Liberties Union of Kansas and

Western Missouri is a statewide affiliate of the national ACLU.  It is a private non-profit

organization with more than 3300 members in Kansas and Missouri.  Defendant Sandra Praeger

(hereinafter "Commissioner") is the Insurance Commissioner for the State of Kansas, charged

with the responsibility of enforcing the challenged statute.

In 2011, the Kansas legislature enacted House Bill 2075 ("the Act").[2]  The Act includes

the following provisions:

> Any individual or group health insurance policy, . . . which is
> delivered, issued for delivery, amended or renewed on or after July
> 1, 2011, shall exclude coverage for elective abortions, unless the
> procedure is necessary to preserve the life of the mother. Coverage
> for abortions may be obtained through an optional rider for which
> an additional premium is paid.[3]

The premium for such a rider must be calculated so that it fully covers "the estimated cost of

covering elective abortions per enrollee as determined on an average actuarial basis."[4]  The Act

defines an "abortion" as any means of terminating a pregnancy other than one done with the

intent to increase the probability of a live birth, to preserve the life or health of the child, or to

remove "a dead or unborn child who died as a result of natural causes," and it defines an

"elective" abortion as one "for any reason other than to prevent the death of the mother upon

---

[1]Plaintiff filed a Second Amended Complaint after Defendant  filed the motion for partial judgment.  The
filing of the Second Amended Complaint does not effect the arguments raised in the motion, however, since it is
essentially identical insofar as Plaintiff's second cause of action is concerned.

[2]*See* H.B. 2075, 84th Leg. (Kan. 2011), 2011 Kansas Sess. Laws 111.

[3]Act § 8(a), amending K.S.A. § 40-2124.

[4]*Id*.

whom the abortion is performed . . . ."[5]

 Plaintiff's Second Amended Complaint ("Complaint") alleges that as a result of the Act, "thousands of Kansas women, including some of Plaintiff's members, have lost or soon will lose their existing insurance coverage for abortion."[6]  The Complaint alleges that insurance coverage, including for abortion, allows women to get the health care they need.  Plaintiff claims the Act was passed "with the purpose of inhibiting women from accessing and paying for abortion care."[7]  It says that women choose abortion for many reasons, including health risks to the mother in the form of hypertension, renal disease, and cardiac problems, and that women may also choose abortion in cases of rape or incest or due to severe fetal anomaly.[8]  Plaintiff alleges that the Act bars comprehensive coverage for abortion in cases of rape or incest or for treatment of miscarriages if the fetus is still alive.[9]  Plaintiff alleges that prior to passage of the Act, a substantial percentage of Kansas women with health insurance had comprehensive plans that covered abortions in the circumstances listed above, and that most women with employer-based insurance had abortion coverage.[10]

 The Complaint alleges that the Act will force women who formerly had insurance coverage to pay more for abortions, that some women will be forced to pay for a separate rider,

---

[5]*Id.* § 8(c) (1) & (2). The Act also includes a provision relating to state health insurance "exchanges," which are a feature of the federal Patient Protection and Affordable Health Care Act. The provision states that no health exchange within the State shall offer health insurance policies that provide coverage for elective abortions, nor shall it offer coverage for elective abortions through the purchase of an optional rider.

[6]Doc. 33, ¶ 2.

[7]*Id.* ¶ 11.

[8]*Id.* ¶¶ 20-22.

[9]*Id.* ¶¶ 13, 23.

[10]*Id.* ¶ 24.

that some insurance companies in Kansas will not offer riders, and that some women who obtain

insurance through their employer will not have access to riders because their employers will not

offer them.  The Complaint alleges that all of these women, as well as women who opt not to pay

for a separate rider because they do not anticipate getting an abortion, will be forced to pay out-

of-pocket for a service that prior to the Act was covered by their comprehensive insurance

plans.[11]  Plaintiff alleges that the cost for an abortion in a clinic is generally between $470 and

$1500, and that hospital-based abortions cost thousands of dollars.[12]

Plaintiff alleges that Kansas does not prohibit insurance companies from providing

coverage—or require them to provide certain types of coverage in a separate rider—for any other

comparable health service, including any health care service needed by men.[13]  Plaintiff claims

that "by prohibiting women from purchasing insurance that covers all of their health care needs

while placing no similar restrictions on men, [the statute] impermissibly discriminates based on

sex."[14]  The Complaint alleges that the Act's only purpose is to make it more difficult for women

to obtain and pay for abortions and that the Act serves no legitimate State interest. The

Complaint's second cause of action alleges that the statute violates the guarantee of Equal

Protection in the Fourteenth Amendment to the U.S. Constitution.

## II.      Standard for Motion for Judgment on the Pleadings

A motion for judgment on the pleadings under Rule 12(c) is reviewed under the same

---

[11]*Id.* ¶¶ 25-30.

[12]*Id.* ¶ 31.

[13]*Id.* ¶ 33.

[14]*Id.* ¶ 4.

standard as a motion to dismiss under Rule 12(b)(6).[15]  To survive such a motion, a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face."[16]  Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[17]  The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully," but requires more than "a sheer possibility."[18]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[19]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[20]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[21]

## III.    Discussion

Plaintiff's second cause of action, under 42 U.S.C. § 1983, alleges that the Act deprives

---

[15]*Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003).

[16]*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 570 (2007).

[17]*Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

[18]*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009).

[19]*Id.* at 1949–50.

[20]*Id.* at 1950.

[21]*Id.*

Plaintiff's members of the constitutional right to equal protection of the laws. The Commissioner argues that Plaintiff's second cause of action fails to state a claim upon which relief can be granted because Supreme Court precedent squarely establishes that opposition to abortion is not sex-based or gender-based discrimination against women.[22] Because of that, she argues, the Act is subject only to "rational basis" review under which it passes constitutional muster if it rationally furthers any legitimate State interest. The ACLU contends the Act constitutes impermissible sex discrimination and is not rationally related to any legitimate State interest. It discriminates, Plaintiff argues, because it allows men but not women to comprehensively insure for all of their sex-specific health needs. Plaintiff argues further that the Act is a gender-based classification that must be justified by a substantially important governmental interest. It contends the Act fails to rationally further any legitimate State interest, let alone a substantial one.

While the standards governing review of abortion-related laws under an equal protection theory are not well established, the standards under the Due Process Clause are clearly drawn.[23] Under the substantive guaranty of liberty embodied in the Due Process Clause, a woman in this country has the right to choose to have an abortion before viability and to obtain it without undue interference from the State.[24] Although the State has a legitimate interest from the outset of pregnancy in protecting the "life of the fetus that may become a child," that interest is not strong

---

[22]*See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993).

[23]*Planned Parenthood of S.E. Penn. v. Casey*, 505 U.S. 833, 846 (1992) (joint opinion) ("Constitutional protection of the woman's decision to terminate her pregnancy derives from the Due Process Clause of the Fourteenth Amendment.").

[24]*Id.*

6

enough prior to viability to overcome the woman's liberty interest in deciding whether to terminate her pregnancy or in obtaining an abortion.[25]  As a result, any state regulation which has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus constitutes an undue burden on that right and violates the woman's constitutional right of due process.

Prior to viability, the State may adopt regulations that create a mechanism by which the State expresses profound respect for the life of the unborn, or which attempt to persuade the woman to choose childbirth over abortion, or which ensure that the woman's choice on the matter is informed, so long as they do not create an undue burden on the right.[26]  Subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate and proscribe abortion except where the abortion is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.[27]  In *Casey* the Supreme Court thoroughly discussed the interests that might justify state regulation of abortion—including the State's interest in potential life—and made clear that the undue burden standard is the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty.[28]  The Supreme Court has yet to fully clarify how these standards apply to an abortion-related challenge under an equal protection theory.

The Fourteenth Amendment to the U.S. Constitution provides in part that no State shall

---

[25]*Id*.; *Gonzales v. Carhart*, 550 U.S. 124, 145 (2007).

[26]*Casey*, 505 U.S. at 877-78.

[27]*Id*. at 879.

[28]*Casey*, 505 U.S. at 876; *Gonzales*, 550 U.S. at 146 ("*Casey*, in short, struck a balance. The balance was central to its holding.").  The Court notes that the State also has a legitimate interest in protecting the health of the woman, but Defendant does not argue that the Act furthers that interest.

"deny to any person within its jurisdiction the equal protection of the laws."[29]  This provision was intended to abolish "all caste-based and invidious class-based legislation."[30]  It seeks to ensure that any classifications made by law are made without respect to persons, that like cases are treated alike, and that those who appear to be similarly situated are not treated differently without, at the very least, a rational reason for the difference.[31]

Equal protection does not guarantee equal results for all, or suggest that the law may never draw distinctions between persons in dissimilar situations.[32]  Almost all laws involve drawing some classification.  The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn is rationally related to a legitimate state interest.[33]  "The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States."[34]  A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill."[35]  When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and presumes that even improvident decisions will eventually be

---

[29]U.S. Const. amend. XIV, § 1.

[30]*Plyler v. Doe*, 457 U.S. 202, 213 (1982).

[31]*SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012).

[32]*Id.*

[33]*City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 440 (1985).

[34]*Plyer*, 457 U.S. at 216.

[35]*Id.* at 217.

8

rectified by the democratic process.[36]  "Under rational basis review, the burden is on the
challenger to show there is no rational basis for the classification; the state need not articulate the
rationale supporting its classification or produce evidence to sustain its rationality."[37]

      This general rule of deference does not apply, however, when a state law employs a
"suspect" classification—such as race or national origin—because those factors are so seldom
relevant to the achievement of any legitimate State interest that they are presumed to reflect
invidious discrimination.[38]  Additionally, any classification that impinges on a right recognized
as fundamental under the Due Process Clause is similarly viewed as suspect.[39]  These types of
classifications are given strict scrutiny by the courts, and will only be upheld if the State shows
that its classification is narrowly tailored to serve a compelling governmental interest.[40]
Classifications based on gender are also considered suspect but are reviewed under an
intermediate level of scrutiny.  Under the intermediate standard, the State must show that the
challenged classification serves important governmental objectives and that the discriminatory
means employed are substantially related to the achievement of those objectives.[41]

      Plaintiff alleges that the Act reflects sex discrimination because it treats women
differently than men in terms of comprehensive health insurance coverage.  The challenged

---

[36]*City of Cleburne*, 473 U.S. at 440.

[37]*Christensen v. Park City Mun. Corp.*, No. 11-4075, 2012 WL 540735, at *2 (D. Utah Feb. 21, 2012)
(citing *Heller v. Doe by Doe*, 509 U.S. 312, 319-20 (1993)).

[38]*City of Cleburne*, 473 U.S. at 440.

[39]*See e.g., Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 499 (1977).

[40]*Clark v. Jeter*, 486 U.S. 456, 461 (1988); *KT.&G Corp. v. Atty. Gen. of Oklahoma*, 535 F.3d 1114, 1137
(10th Cir. 2008).

[41]*United States v. Virginia*, 518 U.S. 515, 533 (1996); *Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256,
273 (1979).

classification is actually neutral on its face, that is, it is not *overtly* based on gender.  It classifies

insurance coverage according to the type of medical procedure involved, singling out certain

abortion coverage for more onerous treatment.  Of course, the fact that a statute is gender-neutral

on its face does not insulate it from scrutiny.  Discrimination may be subtle or covert in nature,

and the adverse impact of a classification upon women can in some circumstances reflect

invidious gender-based discrimination.[42]  As far as the impact of the Act is concerned, it is

obvious that any statute which draws a classification based on abortion will predominantly (if

not entirely) affect women rather than men insofar as the decision to have an abortion and the

ability to obtain an abortion are concerned.[43]  It is fair to say that the Act, on its face, reflects a

general opposition to or animus against certain types of abortion.  But in light of Supreme Court

precedent, this fact standing alone does not give rise to an inference of gender discrimination.  In

*Bray v. Alexandria Women's Health Clinic*,[44] which addressed civil rights claims against

abortion protesters for allegedly engaging in a class-based conspiracy against women, the

Supreme Court rejected the view that opposition to abortion can be equated with animus or

discrimination against women generally:

> Some activities may be such an irrational object of disfavor that, if
> they are targeted, and if they also happen to be engaged in
> exclusively or predominantly by a particular class of people, an

---

[42]*Feeney*, 442 U.S. at 274 ("When a statute gender-neutral on its face is challenged on the ground that its effects upon women are disproportionately adverse, a twofold inquiry is thus appropriate. The first question is whether the statutory classification is indeed neutral in the sense that it is not gender-based. If the classification itself, covert [or] overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination.").

[43]Insofar as the administrative burden of arranging for a separate rider and paying rider premiums are concerned, the Act may primarily effect women but it could effect men as well, as insurance coverage for some women may be provided under policies issued to and paid for by male family members.

[44]506 U.S. 263 (1993).

intent to disfavor that class can readily be presumed.  A tax on wearing yarmulkes is a tax on Jews.  But opposition to voluntary abortion cannot possibly be considered such an irrational surrogate for opposition to (or paternalism towards) women.  Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class—as is evident from the fact that men and women are on both sides of the issue, just as men and women are on both sides of petitioners' unlawful demonstrations.

Respondents' case comes down, then, to the proposition that intent is legally irrelevant; that since voluntary abortion is an activity engaged in only by women, to disfavor it is *ipso facto* to discriminate invidiously against women as a class.  Our cases do not support that proposition.  In *Geduldig v. Aiello*, we  rejected the claim that a state disability insurance system that denied coverage to certain disabilities resulting from pregnancy discriminated on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment.  "While it is true," we said, "that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification."  We reached a similar conclusion in *Personnel Administrator of Mass. v. Feeney*, sustaining against an Equal Protection Clause challenge a Massachusetts law giving employment preference to military veterans, a class which in Massachusetts was over 98% male.  "'Discriminatory purpose,'" we said, "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  The same principle applies to the "class-based, invidiously discriminatory animus" requirement of § 1985(3).  Moreover, two of our cases deal specifically with the disfavoring of abortion, and establish conclusively that it is not ipso facto sex discrimination.  In *Maher v. Roe*, and *Harris v. McRae*, we held that the constitutional test applicable to government abortion-funding restrictions is not the heightened-scrutiny standard that our cases demand for sex-based discrimination, but the ordinary rationality standard.[45]

---

[45]*Bray*, 506 U.S. at 270-73 (citations and footnotes omitted).

Plaintiff's argument that singling out abortion in any manner effectively amounts to sex discrimination is inconsistent with *Bray*, and is further undermined by the Supreme Court's recognition that "[a]bortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life."[46]

Plaintiff contends *Bray* is "irrelevant" because the Act "discriminates against *all* women," not just women seeking abortion. This contention is not clearly explained, but it seems to be based more on Plaintiff's disagreement with *Bray* than with the effect of the Act. Plaintiff relies on *Automobile Workers v. Johnson Controls, Inc.*,[47] but that case lends no support for Plaintiff's position. *Johnson* involved an employer that provided certain jobs involving lead exposure. The employer, citing the health risk to fetuses from lead exposure, adopted a policy excluding all women from these jobs unless they produced medical documentation of an inability to bear children.[48] The Supreme Court found this policy constituted sex discrimination under Title VII, noting that the policy classified on the basis of gender and childbearing capacity rather than on the basis of fertility alone, despite evidence in the record that lead exposure had a debilitating effect on the male reproductive system as well.[49] Thus, the policy was facially discriminatory "because it requires only a female employee to produce proof that she is not capable of reproducing."[50] In other words, men and women were similarly situated because both faced a potential danger from lead exposure, but the employer adopted a policy excluding only

---

[46]*Harris v. McRae*, 448 U.S. 297, 325 (1980).

[47]499 U.S. 187 (1991).

[48]*Id.* at 192.

[49]*Id.* at 198.

[50]*Id.*

women from the job.  This type of arbitrary differential treatment is not the equivalent of a law or classification directed specifically at abortion.  Nor is it accurate to say that the Act is directed at all women.  The Act could be said to adversely affect any woman who might consider an abortion of the type singled out or who wants insurance in place to cover the prospect of such a procedure. But it would not directly impact a woman who would not consider having such a procedure or who does not desire such insurance.  The classification drawn is, like *Bray*, manifestly based on the prospect of abortion, not on the fact that the person who would obtain an abortion is a woman.

Plaintiff further contends the Court must apply intermediate scrutiny because the Act allegedly imposes an affirmative burden on women, unlike *Maher* and *Harris* where the Supreme Court said it was not discriminatory for the government to refuse to provide public funds for women seeking abortions.  It is true that the Court was careful to note in *Maher* and *Harris* that the government had not created any obstacle to abortion by refusing to subsidize the procedure.[51]  But equating the imposition of *any* burden on abortion with discrimination against women generally runs counter not only to *Bray*, but to the logic underlying *Casey*, which said that a State could constitutionally *proscribe* post-viability abortions if the law contains appropriate exceptions.  Implicit in that statement is a view that the ultimate burden—a complete ban—on those abortions not protected by *Casey* would not amount to gender discrimination, despite the obvious adverse impact such a law would have solely on women.[52]

---

[51]*Harris v. McRae*, 448 U.S. 297, 315 (1980); *Maher v. Roe*, 432 U.S. 464, 474 (1977).

[52]*See Maher*, 432 U.S. at 473 ("We recognized in [*Bellotti v. Baird*] that 'not all distinction between abortion and other procedures is forbidden' and that '(t)he constitutionality of such distinction will depend upon its degree and the justification for it.'").

Plaintiff contends that even if a rational basis standard applies, the Act violates equal protection because "a law that simply creates a barrier to abortion with no corresponding interest in informing the woman's choice [] is not a legitimate [means] of advancing the state's interest" in potential life.[53]  In the Court's view, this argument gets closer to the heart of the issue— namely, whether the means used by the State of Kansas to further its interests, including its interest in protecting potential life, can be considered legitimate in view of the individual liberty outlined in *Casey*.

The Court concludes it is neither rational basis nor intermediate scrutiny that applies; the *Casey* undue burden standard must be applied to determine Plaintiff's equal protection claim. *Casey* held that from the outset of pregnancy, the State has a legitimate interest in protecting potential life.  In *Tucson Woman's Clinic v. Eden*,[54] the Ninth Circuit observed that '[i]n the context of a law purporting to promote fetal life, whatever obstacles the law places in the way of women seeking abortions logically serve the interest the law purports to promote—fetal life— because they will prevent some women from obtaining abortions."[55]  Moreover, the court said, this state interest and the interest in regulating maternal health "would generally be significant enough to justify sex discrimination [even] under the intermediate scrutiny standard."[56]  Whether such interests can justify state interference with a woman's liberty to obtain an abortion is precisely the question determined in *Casey*.  As a result, the Ninth Circuit found that "when the

---

[53]Doc. 34 at 12.

[54]379 F.3d 531, 540 (9th Cir. 2004).

[55]*Id.*

[56]*Id.* at 549.

14

state interest asserted to support a law singling out abortion from comparably risky procedures sought by men is maternal health, it is not necessary to determine whether the classification should be deemed gender-neutral, because the interests at stake should be balanced by simply applying the *Casey* undue burden standard."[57]

The Court reaches a similar conclusion here. To the extent the Act creates an obstacle to obtaining an abortion, it can be viewed as rationally furthering what *Casey* said was a legitimate State interest in protecting potential life. But only under *Casey*'s undue burden framework can it be determined whether the means used by the State is a constitutionally permissible means of furthering that (or any other) legitimate State interest. This approach is arguably nothing more than application of the traditional rule that a statutory classification which impinges on a fundamental right may violate the right to equal protection of the laws, although it employs the undue burden standard in place of strict scrutiny.[58] At any rate, insofar as the permissibility of the classification drawn by the Act is concerned, the Court concludes that it must be determined by examining whether the purpose or effect of the law is to create an undue burden on the right to abortion as outlined in *Casey*.

Plaintiff's Second Amended Complaint alleges, among other things, that the Act violates the rights of its members to privacy and liberty under the Due Process Clause. Defendant does not argue here that Plaintiff has failed to state a claim for relief under that theory. And taken as a whole, the Complaint alleges facts which, construed in the light most favorable to Plaintiff,

---

[57]*Id.*

[58]*See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (explaining that the right to an abortion is a fundamental liberty specially protected by the Due Process Clause); *American Const. Law Found., Inc. v. Meyer*, 120 F.3d 1092, 1100 (10th Cir. 1997) ("Under an equal protection analysis, classifications that impinge upon the exercise of a fundamental right are subject to the most exacting scrutiny.").

present a plausible claim for violation of the right outlined in *Casey*.  At this stage of the proceedings, the Court assumes the truth of all well-pled allegations in the Complaint.  The issue here is not whether Plaintiff will prevail, but whether Plaintiff is entitled to offer evidence to support the claims.  Plaintiff alleges that the Act was passed with the purpose of inhibiting women from accessing and paying for abortion care.  The Complaint alleges that health insurance, including coverage for abortion, allows women to obtain the health care they need, and that women need abortions for various health reasons.  According to Plaintiff, most women with employer-based insurance had coverage for abortion, but *as a result of the Act* such women will be forced to pay more for such care and some women will be unable to obtain a rider to cover abortion care.  It alleges that out-of-pocket costs for such care may range anywhere from several hundred dollars up to thousands of dollars for an abortion performed in a hospital. Plaintiff has alleged facts from which it may be able to show that the State law has imposed an undue burden by creating a substantial obstacle to a woman seeking an abortion protected by *Casey*, including a pre-viability abortion or an abortion necessary to preserve the health of the mother.  Such a claim, if proven, would support entitlement to relief under either a due process or equal protection theory.  Accordingly, the Commissioner has failed to show that she is entitled to dismissal of Plaintiff's second cause of action.

      **IT IS THEREFORE ORDERED BY THE COURT THAT** Defendant's Motion for Partial Judgment on the Pleadings (Doc. 29) is **DENIED**.

      **IT IS SO ORDERED.**

Dated: March 29, 2012

                             S/ Julie A. Robinson
                            JULIE A. ROBINSON
                            UNITED STATES DISTRICT JUDGE