IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF KANSAS AND WESTERN MISSOURI | ) ) ) |
| | ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| | ) Case No. 11-2462-JAR |
| SANDY PRAEGER, Kansas Insurance Commissioner, in her official capacity, | ) ) |
| | ) |
| Defendant. | ) ) |
| _____ | ) |

## MEMORANDUM AND ORDER

Plaintiff American Civil Liberties Union of Kansas and Western Missouri brought this action pursuant to 42 U.S.C. § 1983 for redress of alleged violations of its members' constitutional rights by Defendant Sally Praeger's enforcement of Kansas House Bill 2075, codified as Kan. Stat. Ann. § 40-2,190 ("the Act"). The Act prohibits insurance companies from offering comprehensive health insurance plans that cover abortions, unless the abortion is required to prevent the death of the mother.

On June 15, 2012, Plaintiff sought summary judgment (Doc. 57), arguing that the challenged statute violates its members' rights to privacy and liberty, as protected by the U.S. Constitution's Due Process Clause. Specifically, Plaintiff argues that the Act's purpose is improper, that is, that the legislature's predominant purpose in passing the Act was simply to impede access to abortion care, not to serve legitimate state interests. Although Plaintiff initially argued that the challenged statute violates the Constitution's equal protection clause as well, Plaintiff did not pursue this claim on summary judgment. Plaintiff also has not sought summary

judgment on its claim that the statute has the unconstitutional effect of imposing a substantial obstacle to obtaining abortions.  On July 6, 2012, Defendant filed a cross motion for summary judgment (Doc. 65), arguing that the Act does not have the predominant purpose of imposing a substantial obstacle to obtaining abortions and that the Act does not have an unconstitutional effect.  Both motions are currently before the Court and are fully briefed, and the Court is prepared to rule.  As described more fully below, the Court grants in part and denies in part Defendant's cross motion for summary judgment and denies Plaintiff's cross motion for summary judgment.

## I.      Legal Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the

---

[1]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

non-moving party.'"[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[11]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge

_____

[5]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Trasp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[11]*Adams*, 233 F.3d at 1246.

3

and shall set forth such facts as would be admissible in evidence.[12]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]  "Where, as here, the parties file cross motions for summary judgment, [the Court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[14]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[15]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[16]

## II.    Uncontroverted Facts

Many of the relevant facts in this case are not controverted for purposes of summary judgment.

In 2011, the Kansas Legislature passed a series of laws addressing abortion coverage, including section eight of the Act, which prohibits insurance companies from covering "elective"

---

[12]Fed. R. Civ. P. 56(c)(4).

[13]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14]*James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[15]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[16]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

abortions in their comprehensive health insurance policies delivered, issued for delivery, amended, or renewed on or after July 1, 2011.  The Act categorizes as elective any abortion for any reason other than to prevent the death of the mother upon whom the abortion is performed.  Thus, the Act prohibits coverage for abortions that are necessary to prevent severe and permanent harm to the woman's health, such as organ failure, disability, and loss of fertility, to the extent that such effects would not lead to the death of the mother.  There are no exceptions for the health of the mother, for a nonviable fetus, or for pregnancies that result from rape or incest.  Insurance companies may only provide coverage for these and other elective abortions in a separate rider, which must fully cover the cost of elective abortions per enrollee as determined on an average actuarial basis.

Plaintiff ACLU of Kansas and Western Missouri has members who have lost insurance coverage because of the Act, including a member who has insurance through her employer but whose employer has not elected to purchase a rider, and whose insurance company does not offer riders to individual group members.

The cost for an abortion in a clinic ranges from $450 to $1675.  If the abortion is performed in a hospital—which is often the case in situations where the woman's health is endangered or there are fetal problems—it can cost upwards of $10,000.  Some women lack the finances to pay for an abortion out of pocket, and some are forced to delay an abortion while gathering the necessary funds to pay for an abortion.  As the pregnancy advances, the cost of an abortion increases, and the procedure carries more risks.

Prior to the Act's passage, insurance companies comprising over 70% of the insurance market share in Kansas included abortion coverage in their comprehensive policies.  But after

the Act's passage, not all of these insurance companies decided to offer riders to all of their customers.  For example, several do not offer riders to individuals on individual plans or to small groups.  Further, even if a rider is offered for a group plan, the employer alone elects whether to purchase a rider, not the individual employee, and if an individual employee wanted to purchase an abortion rider after her employer elected not to, she would essentially have to forego the policy offered by her employer and buy an individual policy from an insurance company that offered riders to their individual policy holders.  Thus, purchasing the rider will prove difficult for many women.  Even if a rider is available, a woman (or employer) cannot wait until she knows she needs an abortion to buy it. Rather, she must buy the rider prior to becoming pregnant, because companies generally impose a long waiting period between the time the rider was purchased and when it can be used to cover an abortion.  The insurance companies do not anticipate that many, if any, riders will be sold, perhaps due to the difficulty in obtaining the riders.

The Conference Committee Report Brief for House Bill 2075 states that "proponents" of the bill intended it to ensure that private citizens and businesses do not end up financing other person's abortions through premium payments and notes that seven states have passed similar legislation,[17] although this is not a statement of legislative intent.[18]  At least some insurance companies pool the premiums for abortion riders together with other premiums and other sources of income to pay all claims, including abortion claims.  Prior to the Act, if an employer wanted to exclude abortion coverage from its group policy, it could do so.

---

[17]Conf. Comm. Rep. Br., H. Bill 2075, at 8–9 (May 12, 2011).

[18]*Id.* at 1.

In calendar year 2011, 7851 reported abortions were performed in Kansas.  In a similar time span (July 2010 to July 2011), the three major health insurers in Kansas with a combined total of over 70% of the market share had a total of 137 paid claims for abortions (not including treatment for ectopic pregnancy and miscarriage management, and not including claims in self-insured plans).

The Act has not resulted in significant changes in health insurance premiums at the individual level.  Some insurance companies have not reduced premiums at all as a result of the Act or will not implement changes for several years, and insurance companies that have provided figures report per participant plan cost changes in the range of $.04 per month to $.20 to $.50 per month.  These changes are expected to result in decreased aggregate costs in the range of tens of thousands up to the low hundreds of thousands of dollars across all insureds in Kansas.  There is no indication that Kansas legislators contacted the major insurance companies that covered abortions in their comprehensive policies prior to the Act's passage about the Act's expected effects on premium prices.

The Act has not caused abortion providers to change the amount they charge for performing an abortion, although the out-of-pocket costs for women seeking abortions no longer covered by insurance will be higher.  Some women seeking treatment have been turned away because they are unable to pay for an abortion.

## III.    Discussion

Plaintiff argues that the Act is unconstitutional because its predominant purpose is to impede access to abortion, not to serve legitimate state interests.  Defendant argues in response that the Act does not have the predominant purpose of imposing a substantial obstacle to

obtaining abortions but rather that the Act serves several legitimate state interests.  Defendant

also seeks summary judgment on the question of whether the Act has the effect, not just the

purpose, of imposing a substantial obstacle on women seeking an abortion.

In *Planned Parenthood of Southeastern Pennsylvania v. Casey*,[19] the Supreme Court

reaffirmed several core holdings from *Roe v. Wade*, including "a recognition of the right of the

woman to choose to have an abortion before viability and to obtain it without undue interference

from the State,"[20] and "the principle that the State has legitimate interests from the outset of the

pregnancy in protecting the health of the woman and the life of the fetus that may become a

child."[21]  *Casey* recognizes the right of a woman to have an abortion before viability, but this is

not an absolute right.[22]  The state may interfere with that right, provided that the interference is

not undue, that is, that it does not create a substantial obstacle to a woman's decision to exercise

her right.[23]  "A finding of an undue burden is a shorthand for the conclusion that a state

regulation has the *purpose or effect* of placing a substantial obstacle in the path of a woman

seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means

chosen by the State to further the interest in potential life must be calculated to inform the

woman's free choice, not hinder it."[24]

---

[19]505 U.S. 833 (1992).

[20]*Id.* at 846.

[21]*Id.*

[22]*Id.*

[23]*Id.* at 874

[24]*Id.* (emphasis added).

8

The Tenth Circuit also recognizes that, "under *Casey*, a law is invalid if either its purpose or effect is to place a substantial obstacle in the path of a woman seeking to abort a nonviable fetus."[25]  This creates a two part test, with the first part focused on the law's purpose and the second part focused on the law's actual effect.[26]  In determining whether a statute's purpose is proper, the Tenth Circuit has stated that a "[l]egislative purpose to accomplish a constitutionally forbidden result may be found when that purpose was the predominant factor motivating the legislature's decision. Such a forbidden purpose may be gleaned both from the structure of the legislation and from examination of the process that led to its enactment."[27]  And the absence of a clearly constitutional intent does not allow the Court to intuit an unconstitutional purpose; even facing apparently unconstitutional effects from a law, the Court does "not assume unconstitutional legislative intent."[28]  In the summary judgment context, to avoid a nonsuit on the purpose prong, Plaintiff must produce some evidence suggesting an unlawful motive.[29]  The Court address the purpose question first.

### A. The Purpose Prong

Plaintiff has failed to provide any evidence that the Legislature's predominant motivation in passing the Act was only to make abortions more difficult to secure, and this failure is fatal to

---

[25]*Jane L. v. Bangerter*, 102 F.3d 1112, 1116 n.5 (10th Cir. 1996) (citing *Casey*, 505 U.S. at 877).

[26]*Id.* at 1118.

[27]*Id.* at 1116.

[28]*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

[29]*Id.* ("If the motion at issue here were a defendant's motion for summary judgment, and if the plaintiff's only basis for proceeding with the suit were a claim of improper legislative purpose, one would demand some evidence of that improper purpose in order to avoid a nonsuit.").

its motion for summary judgment.  In its first argument, Plaintiff notes that House Bill 2075

passed during the same session as several other bills restricting access to abortion, some of

which have been enjoined by the courts.  But as the Court noted when addressing Plaintiff's

motion for a preliminary injunction in this case, "the mere fact that the [L]egislature passed other

provisions of dubious constitutional validity does not speak to the legislative purpose in adopting

this provision."[30]  For its second argument, Plaintiff also argues that the Act does nothing to

further any of the particular interests the Supreme Court has sanctioned as permissible bases for

regulating abortion, but the Court similarly rejected this argument when addressing the

preliminary injunction motion:

> The court rejects plaintiff's suggestion that any State interest other
> than protecting the potentiality of human life or maternal health
> necessarily renders a state law concerning abortion invalid.  *Casey*
> observed that a statute which, "while furthering the interest in
> potential life *or some other valid state interest*, has the effect of
> placing a substantial obstacle in the path of a woman's choice"
> cannot be considered a permissible means of serving its legitimate
> ends.  *Casey* does not limit the state interests that could underlie all
> state regulations touching on abortion.[31]

Thus, Plaintiff's first two arguments suggesting an improper purpose fail.

In its final argument, Plaintiff argues that the Act, as written, simply cannot serve any

proper state interests, and thus that the Act must be serving an improper purpose.  In reply,

Defendant suggests several state interests allegedly served by the Act: 1) promoting childbirth

over abortion; 2) protecting the consciences of Kansas citizens who object to paying insurance

---

[30]815 F. Supp.2d 1204, 1216 (D. Kan. 2011).

[31]*Id.* at n.7 (citing *Casey*, 505 U.S. at 877) (emphasis added).

premiums that are calculated to include the costs of elective abortions; 3) lowering insurance

costs; and 4) making the public more aware of the actual cost of abortion.

Plaintiff argues that the first interest is improper and that the other interests are merely

pretextual, such that the Act serves no legitimate state interest.  But in this argument, Plaintiff

again misconceives the nature of its burden.  The Court cannot assume unconstitutional

legislative intent just because an Act lacks an obvious, constitutionally legitimate intent, and so

Plaintiff must produce some evidence suggesting an unlawful motive.  Plaintiff has failed to do

so, and so the Court need not address the legitimacy of Defendant's suggested interests.

Even if the lack of a legitimate legislative intent served by the Act were evidence of an

unconstitutional motive, Plaintiff's argument would still fail; three of the four interests

propounded by Defendant are legitimate state interests served by the Act.  Defendant's first

claimed state interest, promoting childbirth over abortion, is a recognized state interest, but the

state cannot enact laws to serve it if those laws simply make abortions more difficult to secure,

without serving any other purpose.  As the *Casey* Court notes, a law that only seeks to strike at

the right to an abortion itself, not a law that serves another valid purpose, is an invalid law.  For

example, the state may enact a measure designed to encourage births that does not further a

health interest, if it is a persuasive, not merely a restrictive, measure.[32]  And a law that serves an

educational role or that otherwise serves a legitimate state interest is not invalid merely because

it impacts abortion.  "The fact that a law serves a valid purpose, not one designed to strike at the

right itself, has the incidental effect of making it more difficult or more expensive to procure an

---

[32]*Casey*, 505 U.S. at 886 (emphasis added).

11

abortion cannot be enough to invalidate it."  Here, then, Defendant's first purported state interest cannot be the sole interest served by a valid statute; if this were the only interest served by the Act, the Act would be unconstitutional.

Nevertheless, although the first purported interest is not legitimate, the Act may still serve any of the remaining three interests suggested by Defendant, and Plaintiff offers no evidence that the other three interests suggested by Defendant are merely pretextual or designed to cover up an unconstitutional purpose.  Addressing the "conscience" interest, Plaintiff notes that premiums for abortion riders are pooled with all other premiums to pay abortion claims, so in one sense this legislation is an accounting sleight of hand, giving the illusion that the abortion funds are separate.  Plaintiff also notes that prior to the Act's passage, an employer could already choose to exclude abortion coverage from its group policy, making the Act unnecessary for employers who did not wish to provide insurance including abortion coverage.  Addressing the insurance cost interest, Plaintiff finally notes insurance rates will likely change very little, if at all, as a result of the Act.

But Plaintiff's objections do not undercut the three remaining purported state interests. First, The Act still allows Kansas citizens who object to paying insurance premiums that are calculated to include the costs of elective abortions to avoid paying those premiums, whether they are covered as individuals or as part of a group plan.  Even though the premiums are pooled, the cost of abortion services is not factored into the premium paid by those in plans that do not cover abortions.  Second, although, as Plaintiff indicates, the Act does not significantly lower insurance rates for individuals, the Act will likely lower insurance costs in the aggregate,

particularly for businesses employing large numbers of people.  And third, the Act could make individuals seeking abortions more aware of the actual cost of  abortion, at least for those individuals who previously would have paid for an abortion with insurance.  All three  of these interests are legitimate state interests, and the Court finds no evidence they are merely pretextual.  As the Court stated in the preliminary injunction order:

> Whether one agrees or disagrees with this asserted cost and/or "freedom of conscience" rationale, there is nothing in the record to show that this was not the legislature's purpose in adopting the law. Moreover, the claimed interests are rational ones that do not necessarily manifest a legislative purpose to create a substantial obstacle to obtaining an abortion. . . .  Whether the practical effect of the law is to actually create a substantial obstacle is another question, but plaintiff has not attempted in this motion to put on evidence to establish such an effect, and the court expresses no opinion here on that question. Insofar as the purpose of the law is concerned, the likely effect of it is not so self-evident that it must be said to manifest a legislative intent to obstruct the right to abortion.[33]

In sum, Plaintiff's argument that the Act must be predominantly motivated by an improper purpose because it does not serve any legitimate state interest fails.

Finally, Plaintiff argues that these interests are legally insufficient to justify burdening abortion.  But this argument misunderstands the purpose test in *Casey*.  The purpose test measures only whether the statute's purpose was to impose an undue burden on abortion rights. *Casey* holds that "an undue burden is an unconstitutional burden," even if the statute imposing the burden serves an important state interest; there is no balancing test.[34]

---

[33]815 F. Supp. 2d at 1216.

[34]*Casey*, 505 U.S. at 877–878.

For these reasons, Defendant's cross motion for summary judgment on the question of whether the Act's predominant purpose was to impose an undue burden on abortion rights is granted, and Plaintiff's cross motion for summary judgment on the same issue is denied.

*B. Effect of the Act*

Defendant also seeks summary judgment on the question of whether the Act has the effect of imposing a substantial obstacle on a woman's right to an abortion.  As a general matter, a law is deemed unconstitutional if it creates on undue burden on the right to an abortion, that is, if its "effect is to place a substantial obstacle in the path of a woman seeking to abort a nonviable fetus."[35]  Defendant suggests she is entitled to summary judgment on this issue based on three arguments, but all three arguments fail.

First, Defendant argues that "[i]n short, plaintiff utterly failed to demonstrate that the [Act] has had any actual impact on women seeking abortions in Kansas."[36]  But the Act does impact at least some women seeking an abortion in Kansas.  As the parties have agreed, prior to the Act's passage, companies comprising over 70% of the market share in Kansas included abortion coverage in their comprehensive policies, coverage that is now only available in a separate rider.  Purchasing the rider will prove difficult or impossible for many women.   From July 2010 to July 2011, the three major health insurers in Kansas with a combined total of over 70% of the market share had a total of 137 paid claims for abortions, and there is no reason to believe that this number is significantly higher or lower than average.  Many of these women

---

[35]*Jane L.*, 102 F.3d at 1116 n.5 (citing *Casey*, 505 U.S. at 877).

[36]Doc. 66, at 31.

will now have to pay the full cost of their abortion, without the benefit of insurance coverage. This increased cost to women seeking an abortion, construed in the light most favorable to the nonmoving party, creates a genuine issue of material fact concerning the existence of an impact on women seeking an abortion in Kansas.

Second, Defendant argues that, even if the Act imposes a burden, the burden is not undue.  Here, Defendant attempts to distinguish between a woman's ability to make a decision to have an abortion and her ability to pay the financial cost of procuring an abortion, relying primarily on cases addressing government funding for births and abortions.  Defendant relies on the Supreme Court's statement in *Harris v. McRae* that "it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices."[37]  Defendant also highlights *Harris*'s statement that the freedom protected by the Due Process Clause "does not confer an entitlement to such funds as may be necessary to realize all of the advantages of that freedom."[38]  Defendant finally relies on *Maher v. Roe*'s holding that an indigent woman who desires an abortion suffers no disadvantage as a consequence of a state's decision to fund childbirth because "the State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there."[39]  Based on these cases, Defendant argues that the Act only affects a woman's ability to pay for an abortion, not

---

[37]448 U.S. 297, 316 (1980).

[38]*Id.* at 317-18.

[39]432 U.S. 464, 474 (1977).

her decision to have one.

While there may be a difference between those two factors in cases involving state funding of abortion, owing to the state's role in providing funds for healthcare in those cases, here it is a distinction without a difference.  The state has imposed a restriction on a private funding mechanism for abortion by preventing many women from continuing to pool resources under insurance policies in order to pay for abortions.  This restriction burdens women's ability to pay using private funds, which is fundamentally different from refusing to provide state funds to women to pay for abortions.  The first is an added burden, while the second is only a refusal to remove a burden.  And the restriction in this case directly impacts how much a woman with insurance will pay out of pocket for an abortion.  As the parties agreed, the cost for an abortion in a clinic ranges from $450 to $1,675, and hospital abortions can cost upwards of $10,000.  Some women lack the finances to pay for an abortion out of pocket, and some are forced to delay an abortion while gathering the necessary funds to pay for an abortion; with insurance that covered the abortion, they would not face these significant challenges.  The undisputed facts on this issue, construed in the light most favorable to the nonmoving party, create a genuine issue of material fact concerning whether the Act imposes an undue burden on women seeking an insurance-funded abortion in Kansas.

Third, Defendant argues that, even if the Act does impose a substantial burden on *some* women, the Act does not impose a substantial burden in a *large fraction* of the cases in which the Act is relevant, as required to meet the undue burden standard under *Casey*.  In *Casey*, the Supreme Court held that showing that a statute will operate as a substantial obstacle in a large

fraction of the cases in which it is relevant is sufficient, albeit not necessary, to show that the statute creates an undue burden.[40]  Whether the large-fraction criteria is met is determined largely by the number of cases in which the statute is relevant—the denominator in the large-fraction equation.  If the demoninator casts a wide net, it becomes significantly more difficult to show that the statute substantially burdens a large fraction of those included in the denominator. Here, Defendant urges the Court to consider the number of cases in which the statute is relevant as the total number of people in Kansas, claiming that all people in Kansas are affected by the statute.  In the alternative, Defendant argues that the Court should consider the group of women who had insurance covering abortion before the Act passed, and who have now lost that insurance, regardless of whether they sought or will seek an abortion.  Defendant claims that the number of women actually affected by the change is only a tiny percentage of either group, because most of those women will not seek an abortion covered by insurance in a given year. Plaintiff argues that the appropriate denominator is women who had insurance coverage for abortion, who no longer do, but who may need an abortion at some point.

The Supreme Court provides guidance on choosing a denominator in *Casey*.  In assessing a spousal-notification requirement for abortions, the *Casey* court took as its denominator the less than one percent of women who were  "married women seeking abortions who do not wish to notify their husbands of their intentions and who do not qualify for one of the statutory

---

[40]*Casey*, 505 U.S. at 895.  *But see Planned Parenthood of Rocky Mountain Serv., Corp. v. Owens*, 287 F.3d 910, 919 (10th Cir. 2002) ("Casey . . . prescribes a showing that the state abortion regulation operates in a large fraction of the cases . . . as a substantial obstacle to a woman's choice to undergo an abortion.") (citations and quotation marks omitted).

exceptions to the notice requirement."[41]  The Court counted only married women, not their husbands.  The Court counted only those seeking abortions, not all married women.  The Court counted only those not willing to notify their husbands, excluding those who would have notified their husbands absent the law in question.  The Court accepted this circumscribed group because, it reasoned, these women were the people who would be affected by the statute, that is, the women whose access to abortion would be limited by the statute.  Here, then, the appropriate denominator is women seeking abortions who would pay for the abortion with insurance but cannot because of the Act.  If husbands who might object to their wife having an abortion were not included in *Casey*, then the entire population of Kansas cannot be included here.  Further, the pool of women who had insurance coverage for abortions but have now lost it is still too broad, given that the *Casey* Court only included those women seeking an abortion.  And, following that reasoning, the denominator cannot include women who would have paid for their own abortion even if they had insurance that could have paid for it; the Act does not affect these women.  The Court acknowledges that using this figure as the denominator makes the large-fraction requirement a low bar, but, as the *Casey* Court noted, whether the Act serves as an undue burden "must be judged by reference to those for whom it is an actual rather than an irrelevant restriction."[42]

 In Kansas, as noted, the three major health insurers had a total of 137 paid claims for abortions over the course of a single year, and taking this figure as a rough approximation of the

---

[41]*Casey*, 505 U.S. at 895.

[42]*Id.*

18

annual average, it suggests that the denominator should be in the range of 140 women.  These women now have to pay for their abortion, should they choose to have one, directly, and not with insurance funds.  Absent more evidence, it is difficult to determine whether this burden is an undue one for a large fraction of these women, but the significant additional costs, considered in the light most favorable to Plaintiff, create a genuine issue of material fact concerning the number of these women whose right to an abortion is unduly burdened by the Act.

Thus, Defendant's cross motion for summary judgment on the question of whether the Act has the effect of imposing a substantial obstacle on a woman's right to an abortion will be denied.  This issue remains to be decided at trial.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion for Summary Judgment (Doc. 57) is DENIED.

**IT IS FURTHER ORDERED** that Defendant's Cross Motion for Summary Judgment (Doc. 65) is GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

Dated: January 7, 2013

 S/ Julie A. Robinson

JULIE A. ROBINSON

UNITED STATES DISTRICT JUDGE